# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**QUINN T. RISNER,**

      **Plaintiff,**

                                              Civil Action 2:17-cv-627

      v.                                      Magistrate Judge Chelsey M. Vascura

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Quinn T. Risner ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 17), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 8). Plaintiff did not file a reply brief. For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

      **I.**      **BACKGROUND**

Plaintiff filed his application for disability insurance benefits and supplemental security income on October 30, 2012. (R. at 212, 221.) Plaintiff's applications were denied initially and upon reconsideration. (R. at 76-77, 94, 109, 149.) Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Karen Sayon (the "ALJ") held a hearing on January 27, 2016, at which Plaintiff, represented by counsel, appeared and testified. (R. at 41-75.)

On March 1, 2016, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 20-33.) On May 19, 2017, the Appeals Council denied Plaintiff's request for review and affirmed the ALJ's decision. (R. at 1.) Plaintiff timely filed this action for review. (ECF No. 1.)

Plaintiff advances two errors in his Statement of Errors. First, Plaintiff contends that the ALJ erred in finding Plaintiff's right arm impairment to be non-severe. Second, Plaintiff maintains that the ALJ erred in determining that Plaintiff's respiratory impairment does not medically meet or equal Listing 3.02(A). The Court limits discussion to evidence bearing on these contentions of error.

## II. RELEVANT RECORD EVIDENCE

### A. Dr. Bruce Chen

Bruce Chen, M.D., Plaintiff's treating cardiologist, examined Plaintiff throughout 2013 and 2014, occasionally documenting symptoms and treatment related to Plaintiff's respiratory functioning. For example, on September 12, 2013, Dr. Chen noted that Plaintiff reported mild dyspnea (difficult or labored breathing) and chest discomfort on exertion. (R. at 751.) Plaintiff reported similar complaints to Dr. Chen on March 21, 2014, although Dr. Chen noted Plaintiff's lungs to be clear to auscultation bilaterally, to have normal expansion, and to have no rales, rhonchi or wheezes. (R. at 748.) Dr. Chen prescribed ADVAIR and inhalers. (R. at 749.)

Two months later, on May 23, 2014, Dr. Chen again noted Plaintiff's lungs to be clear to auscultation bilaterally with normal expansion and no rales, rhonchi, or wheezes. (R. at 746.) Dr. Chen assessed Plaintiff to have chronic obstructive pulmonary disorder ("COPD"), for which he prescribed medications. (R. at 747.) On October 9, 2014, Dr. Chen examined Plaintiff for complaints of new onset coughing and noted heavy wheezing bilaterally, leading Dr. Chen to

2

diagnose Plaintiff with COPD exacerbation. (R. at 743-744.) At the same visit, Dr. Chen noted that Plaintiff reported his dyspnea (difficult or labored breathing) on exertion has improved after starting a new medication, Symbicort, prescribed by Marsha Mitchell, N.P., roughly three months earlier. (R. at 743.)

**B. Dr. Joseph Kearns**

Consultative Examiner Joseph Kearns, D.O., M.P.H., conducted a physical examination of Plaintiff on February 26, 2014. (R. at 703-710.) Dr. Kearns noted that Plaintiff was awake, alert, and cooperative for the examination. (R. at 709.) Dr. Kearns observed a 10-cm scar on Plaintiff's right elbow, but noted that Plaintiff had normal functioning in his right hand in each of the following areas: grasp, manipulation, pinch, and fine coordination. (R. at 704, 709.) Dr. Kearns further noted that Plaintiff has normal range of motion in his right shoulder, right elbow, right wrist, and right finger abductors and adductors. (R. at 704-05.) Dr. Kearns further indicated that Plaintiff had slight flexion defect of the right 4th and 5th fingers, specifically noting that the fingers were slightly flexed and Plaintiff had trouble extending them to the neutral position. (R. at 709.) Dr. Kearns also observed that Plaintiff had mild decreased sensation to the lateral right hand. (*Id.*)

Dr. Kearns made limited reference to Plaintiff's respiratory functioning in connection with his evaluation of Plaintiff's cardiac functioning:

> If [Plaintiff's] results were as described in the above medical record, he would be significantly impaired in his aerobic capacity, and he would also be at risk for sudden cardiac death. There is a bit of a disconnect, however, between his prior cardiac testing and his current physical exam. His cardiac testing reflects someone with significant impairment, his exam did not . . . . But basing this opinion on available cardiac testing and not having additional testing at this time to contradict that and show that it was a transient status I would conclude that he was disabled from all employment.

3

(R. at 709-710.)  Ultimately, Dr. Kearns' relevant diagnoses included status post right arm surgery with some nerve injury and acute respiratory failure.  (R. at 709.)

## C.  April 7, 2014 Pulmonary Function Test

Plaintiff underwent a pulmonary function test ("PFT") on April 7, 2014, at the direction of Dr. Bruce Chen.  (R. at 714-716.)  Dr. Haval Mohammed Saadlla administered the test.  (R. at 714.)  A spirometry test demonstrated Plaintiff's FEV1 (the forced expiratory volume in the first second of a forced expiratory maneuver administered during a spirometry test) to be 1.50, or 31% of the predicted level.  (*Id.*)  Dr. Saadlla noted that Plaintiff "made good effort" and that the "data is acceptable."  (*Id.*)  He concluded that Plaintiff has severe obstructive ventilator impairment without significant bronchodilator response.  (*Id.*)

## D.  Marsha Mitchell, N.P.

Nurse Practitioner Marsha Mitchell treated Plaintiff for, among other things, respiratory complaints in 2014.  On June 25, 2014, Plaintiff reported to Ms. Mitchell that he would like to add another medication to help control asthma and COPD, and noted that he uses his current medications as directed but that he runs out before the prescription is scheduled to be refilled.  (R. at 725.)  On examination, Ms. Mitchell noted labored breathing and auscultation, along with bilateral wheezing, crackling, and decreased breath sounds bilaterally.  (R. at 727.)  Ms. Mitchell prescribed Symbicort.  (R. at 727.)

On July 24, 2014, Plaintiff reported significant improvement to Ms. Mitchell, who noted as follows: "At last visit, [Plaintiff] was started on Symbicort and it has made a big difference in his breathing.  He definitely wants to stay on that."  (R. at 722.)  At that visit, Plaintiff denied experiencing cough or shortness of breath.  (R. at 723.)  Examination revealed non-labored breathing and clear auscultation.  (*Id.*)

4

### E. Chris Banks, OTR/L

Occupational Therapist Christ Banks conducted a functional capacity evaluation of Plaintiff at the request of Nurse Practitioner Marsha Mitchell on April 23, 2015. (R. at 755-759.) Plaintiff reported that he gets dizzy if he walks very far, that his wife has to help him shower, and that he gets short of breath secondary to COPD. (R. at 755.) Mr. Banks noted that Plaintiff "appeared to demonstrate physical performance capability in the sedentary strength range." (R. at 759.) Mr. Banks observed that "[a]ll active range of motion appeared within functional limitation." (*Id.*) As for Plaintiff's endurance, Mr. Banks indicated that Plaintiff "appeared unable to demonstrate the physical capability to perform the frequent lift test or the 120-second step test," and that Plaintiff's heart rate increased and he was short of breath with physical exertion. (*Id.*)

### F. State Agency Medical Consultants

On November 12, 2013, state agency medical consultant Maureen Gallagher, D.O., reviewed Plaintiff's medical records and noted that Plaintiff's most recent physical examination at that time was normal, and that although Plaintiff "does have some dizziness, [he] recovers quickly." (R. at 104.) Dr. Gallagher further noted that Plaintiff had a PFT on October 25, 2013, (the year prior to the PFT noted above) that demonstrated a FEV1 of 1.97, which demonstrates severe obstruction and moderate restriction with bronchospastic component, but Dr. Gallagher emphasized that these results were "not listing level and his current [physical examination] shows his conditions are controlled." (R. at 104, 102.) On May 8, 2014, Elizabeth Das, M.D., also reviewed Plaintiff's medical records and reached the same conclusions as Dr. Gallagher. (R. at 120.) In doing so, Dr. Gallagher accorded little weight to Dr. Kearns' opinion, concluding that it was inconsistent with subsequent medical test results. (R. at 118.)

## G. Hearing Testimony

Plaintiff appeared and testified at the January 27, 2015 hearing. (R. at 41-75.) With respect to his right arm limitation, Plaintiff testified that his right hand hurts and "locks up" when exposed to cold temperatures. (R. at 56, 57.) He further testified that he cannot feel his middle, ring, or pinky fingers on his right hand. (R. at 57.) Plaintiff testified that because of his injury, he cannot pick up items such as money or a sheet of paper. (R. at 65.)

With regard to his alleged respiratory limitations, Plaintiff testified that he loses his breath "real quick" by walking and that exposure to hot temperatures causes his shortness of breath to worsen. (R. at 51, 52.) Due to his symptoms, Plaintiff indicated he can only walk for about one minute before he must sit down. (R. at 59.) Plaintiff testified that he is still taking Symbicort. (R. at 53.)

## H. The ALJ's Decision

The ALJ issued her decision on March 1, 2016. (R. at 14-24.) At step one of the sequential evaluation process,[1] the ALJ determined that Plaintiff had not engaged in substantially

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

gainful activity since August 2, 2013, his alleged date of onset disability. (R. at 22.) At step two, the ALJ found that Plaintiff had the following severe impairments: substance abuse disorder (alcohol), anxiety, obesity, hypertension (HTN), atrial flutter, and COPD. (*Id*.)

Also at step two of the sequential process, the ALJ found Plaintiff's right arm impairment to be non-severe. (R. at 22.) In so concluding, the ALJ noted that Plaintiff had right arm surgery as a teenager with some nerve injury. (*Id.*) The ALJ further noted that although Dr. Kearns reported that Plaintiff had a slight flexion defect of the right fourth and fifth fingers, he noted a normal ability to grasp, manipulate, pinch, and perform fine coordination with the right hand. (R. at 22-23.) The ALJ further observed that Dr. Kearns' findings "revealed normal right upper extremity function in the shoulders, elbows, wrists and fingers" and that the "medical evidence has not indicated any ongoing complaints or treatment for right arm pain or loss of function." (R. at 23.)

At step three, the ALJ further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) In particular, the ALJ concluded that Plaintiff does not satisfy Listing 3.02(A) (chronic pulmonary insufficiency due to any cause). (R. at 23.) In making this determination, the ALJ specifically found that the April 7, 2014 PFT did not establish that Plaintiff meets Listing 3.02(A), reasoning as follows:

> In order to meet Section Listing 3.02A (chronic pulmonary insufficiency due to any cause), the claimant must have an FEV1 equal to or less than values specified, according to the person's height without shoes. Around the time of this testing, the claimant was noted to be 75 inches tall, and, based on height, the claimant had to have an FEV1 value equal to or less than 1.9 in order to satisfy Listing 3.02A. At the pulmonary function test done on April 7, 2014, the claimant obtained a

---

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

FEV1 of 1.50, and FVC of 3.18, resulting in a severe obstructive ventilator impairment. However, reliance on this one-time test is insufficient to satisfy this listing. The testing was not compliant to Listing 3.00E, which indicates that the FEV1 value should represent the largest of at least three satisfactory forced expiratory maneuvers. Moreover, two of the satisfactory spirograms should be reproducible for both pre-bronchodilator tests, and, if indicated, post-bronchodilator tests. This was not done here. Moreover, Listing 3.00E explains that these values must be used as criteria for the level of impairment that exists during the individual's most stable state of health. Here, evidence shows that the claimant did not start taking prescribed medications for COPD until March 2014, which was a month prior to the above noted pulmonary function tests. Finally, the claimant denied [] having any further testing and the evidence has not shown continued signs of symptoms at this level despite prescribed treatment. Lastly, once the claimant received treatment, there is no evidence that the claimant's FEV1 or FVC levels persisted at this level.

(R. at 23-24) (citations to record evidence omitted.)

Further, the ALJ noted that the record evidence reveals diagnoses and treatment COPD, but she emphasized that "several examination reports noted normal respiratory findings," including an August 2013 treatment report by Dr. Damodar in which he documented Plaintiff's lungs to be "clear to auscultation bilaterally"; a September 2013 report in which Dr. Chen noted Plaintiff's lungs to be clear to auscultation bilaterally and that Plaintiff exhibited normal expansion with no evidence of rales, rhonchi, or wheezing; and an October 2013 treatment report from Dr. Poudel in which he documented that Plaintiff's lungs were clear to auscultation bilaterally. (R. at 28.) The ALJ also noted Ms. Mitchell's July 24, 2014 treatment note that Symbicort made a "big difference" in Plaintiff's breathing and also that the examination revealed non-labored breathing and clear auscultation. (R. at 28.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except the claimant can stand and walk four (4) hours and sit about six (6) hour sin an eight (8) hour workday. The claimant must not climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs. The claimant can occasionally crawl, stoop and crouch. The claimant can perform

> frequent but not constant kneeling. The claimant must avoid concentrated exposure to temperature extremes, or respiratory irritants and no exposure to hazards such as work at heights or around dangerous moving machinery like a forklift. The work should involve: simple routine tasks that are not fast paced or have strict time or production demands; superficial interaction with others including public; and work in static settings.

(R. at 25-26.)

The ALJ's decision reflects that she considered the record evidence and relied most heavily on the opinions of Drs. Maureen Gallagher and Elizabeth Das, who gave opinions consistent with the foregoing RFC. (R. at 31.) The ALJ gave no weight to the opinions of Dr. Kearns, agreeing with Dr. Das that his report lacks substantial support in the record, or Mr. Banks, concluding that Mr. Banks is not an acceptable medical source, that his opinion is based on a one-time examination, and that the opinion is inconsistent with a June 2015 report in which Plaintiff was noted to have a normal gait, normal respiratory examination, non-labored respirations, and the ability to exercise. (*Id.*)

The ALJ thereafter relied upon the Vocational Expert's ("VE") testimony to conclude that jobs exist in significant numbers in the national economy that Plaintiff can perform. The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 23.)

### III. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

9

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IV. ANALYSIS

Plaintiff asserts that remand is required because (1) the ALJ improperly found Plaintiff's right arm impairment to be non-severe; and (2) the ALJ improperly determined that Plaintiff's respiratory impairment does not medically meet or equal Listing 3.02(A). The Court finds both assertions unpersuasive.

## A. Plaintiff's Right Arm Impairment

Substantial evidence supports the ALJ's decision as it relates to Plaintiff's right arm impairment. At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational requirement. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803-04 (6th Cir. 2012). The United States Court of Appeals for the Sixth Circuit has construed a claimant's burden at step two as "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863 (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985).

A severe impairment is defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c), and which lasts or can be expected to last "for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). If no signs or laboratory findings substantiate the existence of an impairment, it is appropriate to terminate the disability analysis. *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . .").

Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th

Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

Here, Plaintiff contends that the ALJ erred in finding his right arm impairment to be non-severe. The ALJ, however, determined that Plaintiff had other severe impairments at step two of the sequential evaluation process. Thus, her determination that Plaintiff's right arm impairment is not severe, in and of itself, is of little consequence. Instead, the proper inquiry is whether the ALJ accounted for the limiting effects, if any, of Plaintiff's right arm impairment in determining Plaintiff's RFC.

Although the ALJ did not explicitly account for right-arm limitations in her RFC, her decision demonstrates that she considered and weighed the medical evidence concerning Plaintiff's alleged right arm impairment and determined that it imposes no functional limitations. Specifically, the ALJ acknowledged that Plaintiff had right arm surgery as a teenager with some nerve injury, but emphasized that Plaintiff had a "normal ability to grasp, manipulate, pinch and perform fine coordination on the right hand." (R. at 22-23.) The ALJ further noted that a medical examination revealed "normal right upper extremity function in the shoulders, elbows, wrists and fingers," and that the record "has not indicated any ongoing complaints or treatment for right arm pain or loss of function." (R. at 23.) For the reasons stated by the ALJ, the Court concludes that substantial evidence supports the ALJ's conclusions.

Plaintiff insists otherwise for several reasons, all of which are unpersuasive. First, Plaintiff insists that Dr. Kearns noted "a slight flexion defect" in two of his fingers, along with other right hand defects. (Pl.'s Statement of Errors 13, ECF No. 17.) The ALJ, however, specifically noted Dr. Kearns' finding of a slight flexion defect, but correctly noted that Plaintiff demonstrated normal functioning in the right hand, as set forth above. Further, the Court notes that the ALJ ultimately concluded that the opinion of Dr. Kearns was deserving of "no weight" in light of the report of state agency physician Dr. Das and the fact that Dr. Kearns' review of medical treatment records was incomplete. (R. at 31.) Thus, Dr. Kearns' findings do not undermine the conclusion that substantial weight supports the ALJ's determination.

Second, Plaintiff relies upon the functional capacity evaluation completed by Mr. Banks to argue that the ALJ's decision is not supported by substantial evidence. As Plaintiff points out, Mr. Banks noted Plaintiff's complaints of symptoms related to the right arm, as well as a deficit in right hand grip strength. But the ALJ specifically considered, and rejected, Mr. Banks' report on the grounds that he "is not an acceptable medical source" and his "opinion is based on a one-time examination." (R. at 31.) Moreover, the ALJ emphasized that Mr. Banks' opinion is contradicted by other medical evidence in the record. (*Id.*) As such, Mr. Banks' opinion does not render the ALJ's conclusions regarding Plaintiff's right arm impairment without substantial support.

Finally, Plaintiff argues that his testimony at the administrative hearing demonstrates ongoing functional limitations of the right hand. However, the ALJ considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." (R. at 26.) The ALJ further found that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not

13

entirely credible . . . ." (R. at 29.) As such, and in light of the evidence relied upon by the ALJ as noted above, the Court concludes that the ALJ's decision as it relates to Plaintiff's right arm impairment is supported by substantial evidence.

For all of these reasons, Plaintiff's first contention of error is **OVERRULED**.

## B. Listing 3.02(A)

The Court further concludes that ALJ did not err in determining that Plaintiff's respiratory impairment does not medically meet or equal Listing 3.02(A). In determining whether a claimant is disabled, an ALJ must consider whether the claimant's impairments meet Social Security Listing requirements. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. § 404.1520(d). A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he or she is disabled. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."). The claimant shoulders the burden of producing medical evidence that establishes that all of the elements are satisfied. It is not sufficient to come to close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

Listing requirements for respiratory disorders are set forth in § 3.00 of the Appendix. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 3.00. "The regulations provide that medical evidence is required to document and assess the severity of a respiratory disorder based on the results of various tests, including pulmonary function tests." *Nettlemen v. Comm'r of Soc. Sec.*, No. 17-1822, --- F. App'x ----, 2018 WL 1474967, at *2 (6th Cir. Mar. 27, 2017) (citing Appendix §

3.00(E)); *see also Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that [s]he meets or equals a listed impairment, [s]he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes who the impairment has such equivalency.").

Under the at-issue Listing, Listing 3.02(A), an individual is considered disabled as a result of "[c]hronic respiratory disorders due to any cause except CF with A, B, C, or D." Appendix § 3.02(A). As relevant here, Subpart A requires a claimant to have an FEV1 score equal to or less than certain specified values according to the claimant's height without shoes in order for the claimant to medically meet or equal Listing 3.02(A). *Id.* Specifically, a male such as Plaintiff who is over the age of 20 who measures more than 72.75 inches tall without shoes must demonstrate an FEV1 equal to or less than 1.90 to meet the Listing. *Id.*

Moreover, Listing 3.00(E) explains the "requirements for an acceptable test and report" to demonstrate a valid FEV1 score for purposes of Listing 3.02(A) in relevant part as follows:

> Spirometry, which measures how well you move air into and out of your lungs, involves at least three forced expiratory maneuvers during the same test session. A forced expiratory maneuver is a maximum inhalation followed by a forced maximum exhalation, and measures exhaled volumes of air over time. The volume of air you exhale in the first second of the forced expiratory maneuver is the FEV1. . . . We use your highest FEV1 value to evaluate your respiratory disorder under 3.02A . . . .

Appendix § 3.00(E)(1). Section 3.00(E) imposes additional "requirements for spirometry under these listings," including the following:

> During testing, if your FEV1 is less than 70 percent of your predicted normal value, we require repeat spirometry after inhalation of a bronchodilator to evaluate your repository disorder under these listings, unless it is medically contraindicated. If you used a bronchodilator before the test and your FEV1 is less than 70 percent of your predicted normal value, we still require repeat spirometry after inhalation of a bronchodilator unless the supervising physician determines that it is not safe for you to take a bronchodilator again (in which case we may need to reschedule the

15

> test). If you do not have a post-bronchodilator spirometry, the test report must explain why. We can use the results of spirometry administered without bronchodilators when the use of bronchodilators is medically contraindicated.

Appendix § 3.00(E)(2)(b).

Here, Plaintiff has failed to satisfy his burden to show that his impairments meet the criteria for Listing 3.02(A). Specifically, the record does not contain evidence of a spirometry test that satisfies the Listing requirements. The April 7, 2014 test upon which Plaintiff relies in an effort to satisfy his burden is insufficient for at least two reasons. First, although the test yielded an FEV1 that would otherwise satisfy Listing 3.20(A),[2] the report from that test does not establish that Plaintiff underwent three forced expiratory maneuvers as Listing 3.00(E) requires. This alone renders the test insufficient to establish that Plaintiff meets the Listing criteria.

Plaintiff insists otherwise, arguing that § 3.00(E) sets forth not testing requirements, but rather a definition of what constitutes a spirometric test. According to Plaintiff, the fact that the April 7, 2014 report indicates that a spirometric test was performed implies that the criteria set forth in § 3.00(E) were met, particularly because the administering physician noted that the "data is acceptable." (*See* Pl.'s Statement of Errors 16, ECF No. 17 ("There is absolutely no information in the record to lead one to assume that the test in question did not meet these criteria.").) The Court is not persuaded. Plaintiff bears the burden of producing medical evidence that establishes that all of the elements of a Listing are satisfied. Here, the report Plaintiff produced fails to demonstrate that the April 7, 2014 PFT included three forced expiratory maneuvers. The fact that the report fails to explicitly state that Plaintiff *did not* undergo three maneuvers does not establish that he did. As such, Plaintiff has failed to meet his burden. *See*, *e.g.*, *McCready v. Comm'r of*

---

[2] As set forth above, the test yielded an FEV1 score of 1.50, substantially lower than the 1.90 threshold set forth in Listing 3.02(A).

*Soc. Sec.*, No. 10-13893, 2012 WL 1060088, at *10 (E.D. Mich. Mar. 2, 2012) (concluding ALJ appropriately rejected PFT test where "there is no indication that three maneuvers were performed"); *Higgins v. Callahan*, 983 F. Supp. 865, 871 (E.D. Miss. 1997) (finding that a PFT "test does not comply with the documentation requirements of § 3.00E" where "[t]here is nothing in the record showing that FEV1 score represents the largest of at least three satisfactory forced expiratory maneuvers").

Second, although Plaintiff's FEV1 value was just 31% of the predicted value, it is not clear from the April 7, 2014 report whether the test included a repeat spirometry after inhalation of a bronchodilator, as § 3.00(E) requires. Although the report notes that "[t]here is no significant bronchodilator response," it is unclear whether the bronchodilator was administered prior to a repeat test (or even whether a repeat test was performed and if so what the results were), or whether the note references Plaintiff's use of a bronchodilator before the initial test was administered. (R. at 714.) Consequently, the Court cannot say that the ALJ erred in rejecting the April 7, 2014 report on the basis that it fails to establish that a repeat test was performed.

Plaintiff next contends that the ALJ "offers no support" for her finding that the evidence fails to establish similar FEV1 levels after Plaintiff received treatment and that her conclusion in this regard is inconsistent with the record as a whole. (Pl.'s Statement of Errors 16, ECF No. 17.) The Court disagrees. The ALJ is correct that the record fails to demonstrate that Plaintiff continued to have FEV1 levels similar to 1.50 after treatment because no additional PFTs were performed after Plaintiff started Symbicort.[3] Although Plaintiff points to various treatment

---

[3] Plaintiff accurately points out that "a single valid FEV1 reading can satisfy the Listing" and that with such a test no further PFTs are required. (Pl.'s Statement of Errors 17, ECF No. 17.) The problem with Plaintiff's argument, however, is that he failed to demonstrate that the April 7, 2014 PFT constitutes a valid test, for the reasons discussed above.

records post-dating April 7, 2014, that reflect a diagnosis of COPD, this does not undermine the ALJ's conclusion that the record fails to establish continued FEV1 levels at or around 1.50. Nor do the records Plaintiff points to establish that he otherwise meets Listing 3.02(A). Rather, as the ALJ recognized, "the record does not contain any medical opinion indicating that a listing was met or equaled." (R. at 23.)

Finally, Plaintiff points out that the ALJ erred in rejecting the April 7, 2014 test on the grounds that Plaintiff was not "medically stable" when it was administered because he had initiated pulmonary medication within one month of the test. The Court agrees that this was an improper basis to reject the report. Listing 3.00(E) provides that a claimant is not considered medically stable if he or she changed respiratory medication within two weeks of the test, which implies that a change in medication prior to that will not render the claimant medically unstable. Appendix 1 § 3.00(E). Nevertheless, because the ALJ appropriately determined that the report fails to satisfy § 3.00(E) for the two independently valid reasons discussed above, her error in this regard was harmless.

For all of these reasons, Plaintiff's second contention of error is **OVERRULED**.

## V. DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner of Social Security's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

   /s/ *Chelsey M. Vascura*  
CHELSEY M. VASCURA  
UNITED STATES MAGISTRATE JUDGE